FILED
IN CLERKS OFFICE
2020 JUN 11 PM 1: 56
U.S. DISTRICT COURT
DISTRICT OF MASS.

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CHIUBA E. OBELE )  Civil Action No. _____
Plaintiffs, )
v. )
)
TOWN OF BROOKLINE and )
 and BROOKLINE POLICE DEPARTMENT )  **COMPLAINT FOR DAMAGES**
and BRIAN MERRIGAN, )
and DAVID PILGRIM, )  **JURY DEMAND**
and BORIS VRAGOVIC )
and TALIB MORELAND              , )
Defendants. )
)
)

## INTRODUCTION

1. This is a civil rights action filed by Plaintiff Chiuba Eugene Obele, a Black man,

   proceeding *pro se*, whose rights under the Fourth and Fourteenth Amendments to the

   United States Constitution were violated when:

   a) Mr. Obele was aggressively questioned, made to put his hands against the wall,

   searched and patted down, and had his wallet confiscated by a White police

   officer, **Defendant Brian Merrigan,** in what amounted to racial profiling that

   escalated into harassment.

   b) Mr. Obele was subjected to innapropriate questioning by a White police officer,

   **Defendant Boris Vragovic,** who discriminated against Mr. Obele due to his age

   and race in relation to his girlfriend (an older White woman), called Mr. Obele

   crude names such as a "granny-fucker" and "gold digger," made an racist joke

   about young Black men dating older White women in order to exploit them for

their money, and refused to bring charges against a suspect who threatened to murder Mr. Obele and his girlfriend because (as Vragovic put it), "If a person is desperate enough to date someone more than twice their age, there's no telling what else they might do to get someone in trouble."

c) Mr. Obele was also wrongfully arrested by **Defendant David Pilgrim**, who disregarded crucial eyewitness testimony and prevented Mr. Obele from retrieving evidence that would have corroborated his innocence. At one point, Pilgrim even clenched his weapon and threatened to use force against Mr. Obele, if Mr. Obele tried to retrieve this evidence on his own.

In doing each and all of the things herein alleged, all of these Defendants were acting pursuant to a *de facto* policy from the BROOKLINE POLICE DEPARTMENT and the TOWN OF BROOKLINE, which neglected or intentionally failed to rectify other incidents of police misconduct. Indeed, it is the policy and/or custom of the BROOKLINE POLICE DEPARTMENT and the TOWN OF BROOKLINE to improperly and inadequately investigate citizen and other complaints of police misconduct. As a result of this deliberate indifference to civilian complaints, the Defendant police officers (e.g. Vragovic, Merrigan, and Pilgrim) all felt reasonably immune from any serious threat of discplinary action. The Defendant police officers believed that their actions would not be sanctioned, but would instead be tolerated. Indeed, the BROOKLINE POLICE DEPARTMENT and the TOWN OF BROOKLINE have a pattern of routinely and systematically ignoring allegations of police misconduct, particularly if the civilian is a person of color. When civilians file complaints, the BROOKLINE POLICE DEPARTMENT either ignores the complaint or fails to take any

corrective action. In failing to take any corrective actions, the BROOKLINE POLICE DEPARTMENT and the TOWN OF BROOKLINE have acted with deliberate indifference, and this indifference is a direct and proximate cause of Mr. Obele's injuries as described herein.

2. **Background**: From July 2017 to January 2018, Ms. Heleni Thayre (girlfriend of the Plaintiff) lived with an abusive tenant — Talib Moreland — who frightened her with his anger. On two occasions (October 24, 2017 and November 5, 2017) Moreland made violent threats to harm Ms. Thayre and Mr. Obele that resulted in 911 calls. Yet when told about Moreland's history of being prone to anger and the threats he made, the Brookline Police utterly ignored how this might endanger Ms. Thayre. The police chose to ignore Ms. Thayre's and Mr. Obele's complaints about Moreland, even when presented with clear and detailed descriptions about how he intended to harm both of them. These threats were always downplayed and misclassified as a "tenant-landlord dispute" and consequently ignored. The Brookline police even suspected that Ms. Thayre and Mr. Obele were attempting to expedite the eviction of Moreland, by calling the police and alleging criminal behavior against him. Yet neither Ms. Thayre nor Mr. Obele ever asked the Brookline Police Department to expedite Moreland's eviction. They strictly followed — and never deviated from — the eviction procedure governed by law. Their only request was that the Brookline Police show more concern for the unsafe atmosphere Moreland was creating. Yet the Brookline Police refused to address the threats Moreland made, and essentially allowed Moreland to have a "pass" for his destructive behavior.

3. As Ms. Thayre's boyfriend, Mr. Obele was especially upset at the inappropriate remarks he heard from several officers, who casually remarked to Ms. Thayre that, "he [Mr.

Moreland] is not that much bigger than you, so why are you so afraid of him?" "who cares if he [Mr. Moreland] gets angry. It's his home also and yelling isn't a crime! He's allowed to be angry." "He [Mr. Moreland] might've have said he wanted to stab you, but you have to understand, knives aren't illegal. So what do you expect us to do about it?" Because of their refusal to address his girlfriend's concerns, this left Mr. Obele with the burden and responsibility of making sure Ms. Thayre was kept safe in her home. Yet when Mr. Obele insisted on making sure Ms. Thayre was being supported (and took steps to care for her in an unsafe environment), this angered the Brookline police officers, who made repeated requests that Ms. Thayre keep Mr. Obele out of her home until Moreland had moved out. Mr. Obele refused to comply with these requests. He needed to remain present in the home in order to protect Ms. Thayre from harm. Indeed, Ms. Thayre herself had asked Mr. Obele to be in her home as much as possible, in order to help her feel safe.

4. **Incident involving Defendant Brian Merrigan:** On October 30, 2017, Mr. Obele accidentally triggered the alarm system at his girlfriend's home. Officer Merrigan responded to the alarm and arrived at the home. When Mr. Obele tried to greet Officer Merrigan, he was subjected to aggressive questioning. Officer Merrigan demanded to know where the homeowner was. Mr. Obele indicated that while he did not live in the home, he knew the homeowner and that they were intimate friends. But Merrigan replied, "I don't believe you. Where is the homeowner?" Mr. Obele was offended by how Merrigan was immediately suspicious of him. Mr. Obele replied, "What makes you think I'm not telling you the truth?" Mr. Obele then went to great lengths to verify his relationship with Ms. Thayre. But Officer Merrigan kept accusing Mr. Obele of not

answering his questions about the homeowner's whereabouts. Mr. Obele finally told Officer Merrigan that his girlfriend was being seen by a doctor. Merrigan requested that Mr. Obele call her so he could confirm Mr. Obele's story. Mr. Obele said he did not want to disturb his girlfriend and said she was preoccupied. At that point, Merrigan became angry and once again accused Mr. Obele of being uncooperative. Mr. Obele then agreed to call his girlfriend, but it turned out that she had left her cell phone in the apartment. Merrigan then asked Mr. Obele to leave the home, but Mr. Obele refused to leave. Mr. Obele and Officer Merrigan became involved in a heated exchange. Finally, Officer Merrigan stated that he was fed up with Mr. Obele's attitude. He stated, "Put your hands against the wall right now! If you want to talk back to me like a criminal, then I'll treat you like a criminal." Mr. Obele complied with Officer Merrigan, and kept his arms up against the wall. Mr. Obele was subsequently patted down for "weapons." At one point, he forced Mr. Obele to lift up his shirt as he looked up and down for any "weapons." Officer Merrigan then snatched Mr. Obele's backpack from the ground. Observing this, Mr. Obele stated "Hey, I haven't given you permission to touch my belongings!" Officer Merrigan shouted, "Do not turn around! Face the wall and don't put your hands down!" Officer Merrigan then proceeded to search Mr. Obele's backpack.

5. The Fourth Amendment guarantees the "right of people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." Yet from the very outset, Officer Merrigan displayed an unreasonable suspicion towards Mr. Obele which was based on racial steroetypes. Other than Mr. Obele's skin color, there was no basis to suspect that Mr. Obele had committed a crime or was in the process of

committing a crime. Therefore, Officer Merrigan had no legal cause or excuse to search Mr. Obele or search through his belongings.

6.  Yet perhaps the most egregious invasion of Mr. Obele's dignity was Officer Merrigan's willingness to accept the blantant lie that Mr. Obele had stolen a wallet. When Talib Moreland stepped outside his room and identified himself as a legal resident, he lied to Officer Merrigan and stated that Mr. Obele had "no relationship to the homeowner" and did not have permission to be on the property. Moreland further claimed that Mr. Obele had stolen his wallet. Moreland went into his room, took out his ID, and while concealing his own wallet, told the officer, "As you can see, I only have my ID on me. The rest of my wallet is missing, and I'm convinced he [Mr. Obele] stole it from me." Moreland's story was obviously not credible, since it is inconceivable that Mr. Obele would attempt to steal another person's wallet and pass it off as his own. Furthermore, the wallet contained numerous items that bore Mr. Obele's name and photo. Yet Merrigan accepted Moreland's ridiculous lie and ordered Mr. Obele to return the wallet.

7.  Mr. Obele turned over his wallet to Officer Merrigan. Mr. Obele began to cry and begged the Officer to at least allow him to hold onto the items that had his name and photo on it. Officer Merrigan agreed to let Mr. Obele retain his ID, health insurance card, social security card, and everything with his name and photo. But Merrigan insisted that anything that did not bear Mr. Obele's name belonged to Moreland (this included gift certificates, a transportation pass, and cash). Despite being allowed to hold onto most of the contents of his wallet, Mr. Obele still felt humiliated, and stated to Merrigan, "You knew he [Moreland] was lying to you. Yet you stood there and allowed him to steal money from me. Why?" Merrigan replied,

"I have probable cause to believe that you took something from him. Here's why: First of all, I have no way of confirming your story and you weren't being very cooperative. I asked you to tell me where the homeowner was, and you kept saying that you belong here. And when you finally told me where she was, you refused to call her. When you called her, you couldn't get me on the phone with her. When I asked you to leave, you refused. So you can't blame me for taking his word over yours. Now I let you hold onto most of your stuff, so you should be happy with what you have. Maybe this will teach you not to talk back to cops."

8. At that point, Mr. Obele asked Officer Merrigan for a ride home, since he was without money and his transportation pass. Yet Merrigan laughed at him and refused to take him home. Mr. Obele then walked away, feeling humiliated by the ordeal.

9. **Incident involving Defendant Boris Vragovic:** Under the Equal Protection Clause of the Fourteenth Amendment, the police cannot selectively deny their services to a person simply because of that person's age, gender, race, national origin, or ethnicity. Yet this is precisely what occurred when Officer Vragovic refused to charge Talib Moreland with committing a criminal offense. On November 5, 2017, Mr. Obele called 911 and reported that violent threats had been made against him and his girlfriend, Ms. Heleni Thayre. That evening, when Moreland entered the home, Ms. Thayre and Mr. Obele both observed Moreland glaring at him. Moreland then abruptly went into his room, closed the door, and began yelling out that he had a gun, and that he intended use it to murder Mr. Obele and his "white bitch." These allegations were sufficiently detailed enough to establish probable cause to charge Moreland with a criminal offense. However, Officer Vragovic refused to charge Moreland with committing a crime. Officer Vragovic justified this decision by indicating that Moreland had his door closed at the time he made his threats, and did not mention either Ms. Thayre or Mr. Obele by name. However, this

explanation is not convincing. In order for a report of criminal threats to be actionable, *it is not necessary that the threat be communicated directly to the victim, or that the victim be specifically identified by name.* Officer Vragovic likely knew this to be the case, and yet he chose not to charge Moreland with making criminal threats.

10. The real reason why Officer Vragovic chose not to charge Moreland was because Vragovic harbored personal animus towards Mr. Obele – specifically Mr. Obele's decision to date an older White woman. Initially, Vragovic was unaware of the age and racial difference between Mr. Obele (who is Black, and was 27-years old) and Ms. Thayre (who is White, and was 73-years old). Yet when Vragovic saw the couple together, he gave them disdainful looks and treated them in a very disrespectful manner. At one point while talking to Mr. Obele, Vragovic had the temerity to ask him, "What business do you have being with someone her [Ms. Thayre's] age? Don't you think that's a little weird?" Vragovic then questioned Mr. Obele about Ms. Thayre's finances, and whether Mr. Obele's sole purpose in dating Ms. Thayre was to exploit her financially. When Mr. Obele indicated that he was offended by Vragovic's line of questioning, Officer Vragovic inappropriately joked about interracial relationships and replied, "Chill out. I'm just saying, not too many brothas [Black men] I know are dating White women who look like that, unless they're hoping to get in on some serious inheritance money."

11. While on the scene, Mr. Obele also overheard Officer Vragovic talking to Lieutenant John Canney, referring to Mr. Obele in very unflattering terms as a "granny-fucker" and "gold digger." Vragovic also began discussing Mr. Obele's supposed lack of credibility as a witness, stating, "I don't trust that guy's word. If a person is desperate enough to date someone more than twice their age, there's no telling what else they might do to get

someone in trouble." Plaintiff sincerely believes that had Ms. Thayre been an older White man, and Mr. Obele been a younger Black woman, Officer Vragovic would have seen the situation rather differently, and considered the dating relationship to be more acceptable.

12. **Incident involving Defendant David Pilgrim:** On November 18, 2017, Mr. Obele was wrongfully arrested by Defendant David Pilgrim, who refused to let Mr. Obele retrieve footage from home security cameras, which would have corroborated his innocence. Pilgrim also refused to acknowledge the testimony of Mr. Obele's girlfriend, who despite being awake to witness the events that morning, was dismissed by Pilgrim because, "Old people love to sleep. They don't wake up that easily. She couldn't have been awake to see or hear anything…I suspect she has some kind dementia." Mr. Obele then asked Officer Pilgrim if he could share footage from the security camera with him, believing it would corroborate parts of his story. Yet Officer Pilgrim refused to let Mr. Obele leave his sight. When Mr. Obele asked Pilgrim to escort him so that he could retrieve the footage, Officer Pilgrim replied, "I just don't care what you have to show me. I'm not gonna let you share footage with anyone. And if you try to move, I'll put these handcuffs on you." Pilgrim then explained that the police were upset at Ms. Thayre, because she would not obey their request to keep Mr. Obele out of the home until the eviction was over. Pilgrim stated, "We're not gonna put up with your games anymore. If she [Ms. Thayre] won't keep you out of here, then we're gonna arrest you and make sure you stay out of here for good!" At that point, Officer Pilgrim began clenching what appeared to be either a firearm or some kind of baton. He stated, "You better not move, because if you try to leave this room, I'll have grounds to use force against you!" Shortly after that, Mr.

Obele was arrested and charged with Assault and Battery with a Dangerous Weapon, Resisting Arrest, and Witness Intimidation.

13. Police officers have a duty to investigate easily accessible evidence before making an arrest. Officers cannot simply turn a blind eye toward potential exculpatory evidence. Importantly, in evaluating probable cause, an officer may not "unreasonably disregard[] certain pieces of evidence" by "choos[ing] to ignore information that has been offered to him or her" or "elect[ing] not to obtain easily discoverable facts" that might tend to exculpate a suspect. Kingsland v. City of Miami, 382 F.3d 1220, 1229, 1233 (11th Cir. 2004); see Carter v. Butts Cty., 821 F.3d 1310, 1321 (11th Cir. 2016) (explaining that "no reasonable officer with the information that was readily available to [defendant] at the time he arrested [p]laintiffs could have believed that he had probable cause to arrest them for burglary, criminal trespass, or theft," where defendant ignored documentation that plaintiffs attempted to present to him establishing that they were authorized to be on the property).Yet rather than conduct an honest and fair investigation into the allegations against Mr. Obele, Officer Pilgrim was determined to arrest him at all costs, even if this meant preventing Mr. Obele from corroborating his story. And as a result of this wrongful arrest, Mr. Obele was forced to endure emotional distress.

14. **Municipal Liability for Police Misconduct:** Merrigan, Vragovic, and Pilgrim are Law Enforcement Officers employed by the Town of Brookline. At the time of these incidents, it was the policy and/or custom of Defendant Town of Brookline to inadequately supervise and train its officers, staff, agents, and employees, thereby failing to adequately discourage further constitutional violations on the part of their officers, staff, agents, and employees.

15. **Defamation of Character and Malicious Prosecution by Talib Moreland (November 17, 2017):** This is also a Complaint for damages in response to Defamation of Character and Malicious Prosecution in the form of a false police report. On November 18, 2017, Talib Moreland intentionally fed the police incorrect information, in order to implicate Mr. Obele for a crime he did not commit. Moreland reported to police that Mr. Obele had assaulted him with a folding table. Yet security camera footage taken inside Ms. Thayre's home records Moreland acknowledging that no physical contact was ever made between him and Mr. Obele. Moreland is also on camera admitting that he wanted to exact revenge upon Mr. Obele. In the footage, Moreland states that he planned on calling the police on Mr. Obele because "that's the only way I can use a fucking finger on his ass [is by] calling the police." Moreland even claims that he hoped Mr. Obele would somehow end up dead, stating the he hoped the police would "kill this fucking monkey" and "lay his ass down." Altogether, these statements show that Moreland made allegations with knowledge of their falsity, with reckless disregard of the truth, and with actual malice toward Mr. Obele, with the intent to injure him.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under the United States Constitution as applied to state and/or local authorities through 42 U.S.C. § 1983; and pursuant to 28 U.S.C. § 1343 because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights, and to recover damages for the violation of those rights. This Court also has jurisdiction under 28 U.S.C. §§ 2201 and 2202 to declare the rights of the parties and to grant all further relief found necessary and proper.

17. Venue is proper pursuant to 28 U.S.C. § 1391(e), which provides that a civil action may be brought in a judicial district in which a substantial part of the events giving rise to a claim occurred. All or a substantial part of the events, transactions, and occurrences giving rise to this lawsuit occurred within the geographical environs of the Eastern Division of the District of Massachusetts.

## PARTIES

18. Plaintiff Chiuba Eugene resides in Boston, Massachusetts. Plaintiff is a African-American and Black male and a member of a protected class. He was 27 years old at the time of the incidents described in this Complaint.

19. Defendant Town of Brookline is a Massachusetts municipality with the Town Clerk's office located at Town Hall, 333 Washington Street, Brookline, MA 02445

20. The Defendant, Brookline Police Department, is a municipality organized police department within the Town of Brookline, with a principal address at 350 Washington St., Brookline, MA 02445.

21. Defendants Brian Merrigan, Boris Vragovic and David Pilgrim are officers of the Brookline Police Department. At all relevant times, they were acting under color of law within the course and scope of their duties as Brookline Police Department officers, and as agents and employees of the Town of Brookline. Defendants Merrigan, Vragovic, and Pilgrim are sued in their individual capacities. Their principal office can be found at 350 Washington St., Brookline, MA 02445.

22. Defendant Town of Brookline operates the Brookline Police Department, a law enforcement agency, and is a municipality capable of being sued. The Town is the legal entity responsible for the Brookline Police Department. Plaintiff bases all applicable and

appropriate claims as to Town of Brookline and the Brookline Police Department on the doctrines of municipal liability.

23. During the events described in this Complaint, Officers Pilgrim, Vragovic, and Merrigan were duly appointed and acting as police officers of the Brookline Police Department, acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs and usages of the the Brookline Police Department.

24. At all material times, Defendants Town of Brooklin, Merrigan, and Pilgrim, were engaged in conduct that was the proximate cause of the violations of Plaintiff's federally protected rights and the damages suffered therefrom.

25. Upon information and belief, Defendant Talib Moreland is a resident of Massachusetts, and at the time of the events alleged in this Complaint, was a roommate and tenant to Plaintiff's girlfriend, Heleni Thayre. Upon information and belief, he resides at 128 Evans Street, Apartment #3, Dorchester, MA02124

## FACTS COMMON TO ALL COUNTS

26. On October 1, 2017, Ms. Thayre formally initiated an eviction of Talib Moreland — a roommate who had originally moved in on July 10, 2017 with his girlfriend, Moriah Miller. Since the time he arrived and became a resident of her condo, Moreland routinely became irritable whenever Ms. Thayre made casual reminders to follow through with his household chores. These polite reminders were never intended to cause him any nuisance, but were nonetheless made, since he agreed to do weekly housework pursuant to the lease agreement which he signed. For this reason, Ms. Thayre expected Moreland to do his part and assist her — an elderly woman with health issues — in maintaining a clean, healthy

living space. Instead of doing what he was contractually obligated to do, Moreland left Ms. Thayre to do all this housework by herself, overwhelming her and placing serious strain on her wellbeing. Taking advantage of Ms. Thayre in such a way constituted a form of abuse that left her feeling exploited and helpless as she tried caring for a home she owned and cherished for 37 years.

27. Furthermore, the decaying food and unwashed plates that Moreland kept in his bedroom were left out in the open for days at a time, and resulted in a re-infestation of mice in the home.

28. Moreland also ignored Ms. Thayre's repeated requests to keep her home smoke-free and routinely frustrated her neighbors who complained about his behavior. And as this all played out, Moreland would return to the home intoxicated and smelling of marijuana and alcohol. His rampant drug use caused frequent impairment, to the point where he became confused and unaware of his own actions, or even maintain basic comprehension of others.

29. Even more concerning was Moreland's record of assault. This included an incident where Moreland verbally accosted a young woman and attempted to strangle her, all because she had taken his cigarettes without his permission. Regardless of whether this woman actually did or did not take Moreland's cigarettes, what this shows is that Moreland was capable of threatening and committing violence over minor annoyances and personal items of trivial value.

**October 24th incident: Moreland makes threats over a plate.**

30. On October 24, 2017, Ms. Thayre wrote a note to Moreland asking him to return her favorite plate, after Moreland failed to return it to her. Moreland was not allowed to take plates from Ms. Thayre's cabinet, since he had his own plates in a separate cabinet.

31. On the evening of October 24, 2017, Ms. Thayre spoke directly to Moreland about improper garbage disposal. She asked Moreland not to dispose his trash in the neighbor's can, and also asked him to clean up the trash stains he had left on the stairways. Moreland agreed to do these things, though he had a tendency not to follow through with his promises.

32. At that point, Mr. Obele intervened and asked Moreland to also return Ms. Thayre's personal plate as soon as possible, because he didn't want Moreland taking her stuff without her permission. Moreland agreed to return the plate, and went inside and closed the door.

33. Ms. Thayre left, but Mr. Obele waited for ten minutes, hoping that Moreland would do what he agreed to do. When Moreland failed to return the plate, Mr. Obele knocked on Moreland's door. When Moreland opened the door, Mr. Obele asked Moreland to wash the personal dish and immediately return it to Ms. Thayre. At that point, Moreland became visibly upset and stated, "What do you want from me?" Mr. Obele replied, "I just want you to return the plate to her [Ms. Thayre] before going to bed." Moreland replied, "You better not knock on my door again, or I will seriously fuck you up. I mean it."

34. Upon hearing this, Mr. Obele replied, "There's no need to talk to me like this. I am just asking you to return her plate. You said you would return it. So why not do it now?" Moreland then stepped outside his room and drew closer to Mr. Obele and said, "Look, I

get it, okay. You're just trying to throw your weight around. But I am not the one to fuck with. You don't want to fuck with me. Don't ever knock on my door again. If you try to bother me again, I will fuck you and your girlfriend up."

35. When Ms. Thayre emerged from her office to see what the commotion was, Mr. Obele said "We've both been threatened." At that point, Mr. Obele walked away, called 911, and reported that threats were made against him and Ms. Thayre.

36. When Officer Brother and Pilgrim arrived, they showed no concern for Ms. Thayre's safety, despite the threats reported. Officer Brother even went so far as to suggest that Ms. Thayre should not ask for the return of her personal property, and that Mr. Obele was responsible for creating the problem rather than Moreland.

37. At that moment, Mr. Obele told Officer Brother, "Do you know my girlfriend has to sleep with pepper spray when I'm not here to protect her. She carries a panic alarm around the house, in case he [Moreland] attacks her. This is no way to live!" Officer Brother replied, "Why are you [Ms. Thayre] carrying mase with you? You're not trained to use that." Ms. Thayre replied, "Excuse me sir, I have a right to protect my life! I'm a 73-year old women. I live alone with this man. And for your information, I did call your station asking for training! Your department offers no such thing!"

38. Officer Brother advised Ms. Thayre that she should evict Moreland if she was unhappy with his behavior. Ms. Thayre reported that the eviction was already underway.

39. At that point, Ms. Thayre indicated that she was in fear for her safety, given the threats Mr. Obele reported. She stated, "What Chiuba [Obele] is describing is far worse than anything I've heard him [Moreland] say before. You can't live me alone with him! Do

you know he has criminal record? I've looked into this after he started becoming angry around me. I even found out he's a sex offender!"

40. Officer Brother replied, "I've already told you. There's nothing we can do. You're making a big deal out of nothing. All you have to do is stay away from him [Moreland] and wait until the eviction is over." Ms. Thayre replied, "But that could take several months! Don't you realize I have to live with him [Moreland] every day?"

41. At that point, Officer Brother replied, "You could always find another place to stay at, if he [Moreland] makes you feel unsafe." Ms. Thayre was offended by this suggestion, since the home belonged to her and contained many precious valuables and personal art work. Ms. Thayre did not feel comfortable leaving Moreland alone in the home unsupervised, especially given his habit of causing disruption.

42. At that moment, Mr. Obele exorted to Officer Brother to take Ms. Thayre's concerns more seriously, and asked that the officers search Moreland's room for weapons. Mr. Obele stated, "You have to make sure nothing happens to her. I want you to search his room and make sure he [Moreand] has no weapons." Officer Brother replied, "You never told us anything about weapons. Now all of a sudden you want want us invade his privacy? My partner says the guy didn't do anything wrong. We have no reason to believe he isn't telling us the truth."

43. Mr. Obele asked Officer Brother what he was going to do to ensure Ms. Thayre's safety. Officer Brother replied "I don't see much I can do. There's no crime here. If you want to make a complaint, you have go to the court and do it yourself. And I doubt a judge would do anything about this. If I were you, I would just let this go. But it's your choice. You better be prepared to convince a judge and persuade him that this was anything serious."

In saying these words, Brother downplayed the seriousness of Moreland's threats, suggesting that they did not rise to a level where bringing any charges was appropriate. Ms. Thayre replied, "Based on what you're telling me, it sound like I have to think about it."

44. Mr. Obele and Ms. Thayre were unhappy with Officer Brother's lack of concern for their safety. So they decided to write letters delineating their concerns and went to the Brookline police station the following day, on October 25, 2017. They wanted the letters to be included in the police report regarding the 911 call Mr. Obele made. They indicated to the offier at the front desk that they were concerned by Officer Brother's comments and his focus on the eviction process, instead of the threats Moreland had made. The officer at the front desk (whose name they did not record) indicated that the threats Moreland made of wanting to "fuck up" Ms. Thayre and Mr. Obele were too "vague" and not detailed enough to concern the police. He nonetheless told Mr. Obele and Ms. Thayre he would pass along the information they provided to Officer Brother. The officer at the desk declined to take the letters that Ms. Thayre and Mr. Obele had written.

45. The following day, on October 26, 2017, Officer Brother contacted Ms. Thayre and had a conversation with her. He began questioning Ms. Thayre about Moreland's height and weight. When she described Moreland's height and weight, Officer Brother stated that she had no reasons to fear him. He stated, "He [ Moreland] is not that much bigger than you, so you have no reason to be afriad of him." In making this remark, Officer Brother seemed to disregard the fact that Ms. Thayre was a 73-year old women with health problems, living alone with Moreland who was 40-years old and had spent time in jail.

46. After that, Ms. Thayre spoke to Mr. Obele and reported what Officer Brother said to her. Mr. Obele was outraged by Officer Brother's comment and lack of concern for her safety.

**Incident involving Officer Merrigan (October 30, 2017)**

47. Earlier in the year, Mr. Obele had received a complimentary security system from his job, which he gave to his girlfriend as a gift. Initially, the alarm system was not installed in the home. But shortly after Moreland moved into the apartment, he began to display anger and eventually began making threats to harm Ms. Thayre. It was at that point that Mr. Obele suggested that they install the security system in the home, to ensure Ms. Thayre's personal safety.

48. On Monday, October 30, 2017, Mr. Obele had been staying at Ms. Thayre's condo for a couple of days since sleeping over Saturday night on October 28, 2017. At the time, Mr. Obele would visit Ms. Thayre's home on a weekly basis, sometimes for several days at a time.

49. That afternoon when Ms. Thayre had left for an MRI appointment, Mr. Obele stayed inside to do work on his computer. He left briefly to grab food nearby. He returned to Ms. Thayre's condo to prepare a meal from groceries he purchased from a nearby store. At the time Mr. Obele left, there was no one else in the home.

50. Once Mr. Obele returned and finished eating, he decided to enter Ms. Thayre's room to sleep. He was unable to sleep in the guestroom that afternoon, since Ms. Thayre had a friend living there for the day. Mr. Obele decided to lie down on the floor next to Ms. Thayre's bed (because she complains he is too heavy to lay on it).

51. At that point, Mr. Obele spotted a remote to the alarm system, underneath her bed. He knew she had been searching for it for days. This alarm was very important to her. It gave

her a sense of safety and protection. However, in trying to retrieve this remote, Mr. Obele accidentally triggered the panic feature. Within minutes, the monitoring company called the house phone, and though he tried to explain this was triggered unintentionally, Mr. Obele was not able to provide the correct safe-word to the dispatcher on the other end.

52. Mr. Obele worked for the company that manufactured the alarm system. He was familiar with the protocol to send out police to ensure the safety of the residents in the home. So when he heard the doorbell, he went downstairs immediately and greeted Officer Brian Merrigan.

53. From the very beginning, Officer Merrigan was suspicious towards Mr. Obele. Before Mr. Obele even had a chance to explain what occurred, Officer Merrigan demanded that Plaintiff Obele tell him where the homeowner was.

54. Mr. Obele made it known to Merrigan that he and Ms. Thayre were intimate friends and partners for over three years. He tried to explain to Officer Merrigan that this was only a false alarm. To prove this point, Mr. Obele showed him the alarm remote. Officer Merrigan responded, "I don't believe you. Where is the homeowner? Show me your I.D. now!"

55. Mr. Obele gave the officer his ID. Officer Merrigan asked him where did he get permission to be in the building. Mr. Obele replied, "I know the homeowner, sir. We are close friends. We've been together for three years. Her place is like a second home to me!"

56. To show his familiarity with the home, Mr. Obele used a Master PIN that only the homeowner would know, to access the alarm menu on the keypad by the wall. He also

logged into the alarm system on his phone, to show that Ms. Thayre gave him full, authorized access to her home, because she trusted him with her security.

57. Mr. Obele made it clear that there was no foul play whatsoever. Yet Officer Merrigan refused accept this explanation, stating, "I don't know what this has to do anything I asked you. I just need you to tell me where the homeowner is. I want to hear directly from her that you're telling me the truth."

58. Mr. Obele felt embarrassed for failing to remember Ms. Thayre's safeword when contacted by the monitoring center, and politely apologized to Merrigan for any inconvenience he caused. But none of what he said seemed to have any impact on Officer Merrigan, who stated, "I don't need to hear any apologies from you. If you can't tell me where the homeowner is, then I'll have to arrest you for trespassing!"

59. "Excuse me?" Mr. Obele replied, "Why would you assume that I'm an intruder?"

60. Once again, Mr. Obele was startled by Officer's Merrigan aggressive stance. He knew from his professional experience as a worker for SimpliSafe, that false alarms were quite common, and that for most policemen who responded to these alarms, it was usually sufficient to see if there were any signs of forced entry. To prove that he was no intruder, Mr. Obele showed Officer Merrigan the keys Ms. Thayre gave him to enter her home. And since none of the doors in the home were forced open, and there were no signs that any windows were broken, Mr. Obele told him it was unreasonable to arrest him for trespassing. Officer Merrigan became upset that Mr. Obele questioned him, stating "You don't get to lecture me. I know how to do my job. Oh, by the way, you still haven't told me where the homeowner is."

61. Finally, Mr. Obele told Officer Merrigan that Ms. Thayre had left for an MRI appointment and was not available to speak. Merrigan replied, "I need to confirm your story. Get her on the phone. I want to speak to her." Since Ms. Thayre was being seen by a doctor at the time, Mr. Obele felt that it was unnecessary to disturb her, and there were less intrusive means of verifying who he was. For instance, he showed Officer Merriggan his personal belongings, and stated that he slept over at her home on a weekly basis. On this particular day, Mr. Obele had spent the previous two nights sleeping in the home. Yet this did not register with Officer Merrigan, who only grew angrier by the second, yelling, "What don't you understand? Are your dreadlocks blocking your ears? I said get her on the phone! Don't make me repeat myself" When Mr. Obele reluctantly agreed to call Ms. Thayre, to his surprise, he heard her cell phone ringing from the office down the hall. It appears that in her haste to make her appointment, she left her phone at home. And since Mr. Obele didn't know the name of the physician treating her, there was no other way to get in touch with her.

62. Still, Plaintiff Obele sought other ways of verifying his relationship with her. He showed Merrigan photos of Ms. Thayre in the dining room, and then showed him photos on his cell phone that depicted the same woman, which depicted the two embracing each other and smiling.

63. Upon discovering the age difference between Ms. Thayre and Mr. Obele, Merrigan became rude and disrespectful,  stating to Plaintiff: "You're half her age. What the hell are you two even doing together!" Mr. Obele responded with outrage, "Excuse me sir, I did not know what that has to do with anything. All I'm showing you is that I have permission to be here!" Officer Merrigan responded, "None of this matters to me. If she's

not here in the home with you, then you don't have permission to be here when the alarm
goes off! End of story!"

64. Officer Merrigan and Mr. Obele got into an heated argument, because Mr. Obele did not
believe he had the authority to decide who Ms. Thayre could invite into her own home.
And to show further proof that he had intimate knowledge of who she was, Mr. Obele
showed him countless text messages and emails he exchanged with her. He even went as
far as naming all her siblings and the pets she owned. Yet again, this did not register with
Officer Merrigan, who accused Mr. Obele of being uncooperative, stating "You don't get
it, do you? I am a police officer. That means as long as I'm here and she isn't, you only
have to answer to me!" Mr. Obele replied, "This is absurd! Heleni [Thayre] owns the
house! I showed you the keys to the home. I've given you plenty of proof that we are
close and that she wants me here. What more do you need to believe me?"

65. Officer Merrigan took this as a sign of disrespect. He stated, "Enough of this. Put your
hands against the wall right now! If you want to talk back to me like a criminal, then I'll
treat you like a criminal."

66. Mr. Obele complied with Merrigan, and kept his arms up against the wall. He was patted
down for weapons. Plaintif Obele complained about this treatment, and indicated that he
would report the officer for "bullying" him.

67. At that point, Merrigan snatched Mr. Obele's backpack from the ground. Observing this,
Mr. Obele stated "Hey, I haven't given you permission to touch my belongings!" Officer
Merrigan shouted, "Do not turn around! Face the wall and don't put your hands down!"
Merrigan then proceeded to search Mr. Obele's backpack. At one point, he forced
Plaintiff to lift up his shirt as he looked up and down for any "weapons."

68. During this whole exchange, Moreland was inside his room. Moreland came out of his room and identified himself as a legal resident of the home. Moreland lied to Officer Merrigan and stated that Mr. Obele "had no direct relationship to the homeowner," and that he had broken into the home and taken Moreland's wallet away from him, pretending to pass it off as his own. At that point, Mr. Obele lowered his hands and turned around to tell Officer Merrigan that Moreland's story wasn't credible.

69. Moreland said he would prove that Mr. Obele stole from him. He went into his room and apparently took out his ID from his own wallet, went outside his room to show Officer Merrigan just his ID and stated, "As you can see, Officer, I only have my ID on me. The rest of my wallet is missing, and I'm convinced he stole it from me."

70. Officer Merrigan accepted Moreland's ridiculous lie. He stated, "You heard him. Give the man his wallet back! And don't try to question me this time. Just do what I tell you to do!"

71. Plaintiff Obele was outraged over this, but facing threat of arrest, he turned over the wallet to Officer Merrigan.

72. Plaintiff Obele began to cry and begged the Officer to at least allow him to hold onto the items that had his name and photo on it. Officer Merrigan agreed to let Mr. Obele retain his ID, health insurance card, social security card, and everything with his name and photo. But Merrigan insisted that anything that did not bear his name, belonged to Moreland, including gift certificates, a transportation pass, and cash.

73. Despite being allowed to hold onto the some of contents of the wallet, Plaintiff Obele was still humiliated that he had to give up some of his items, and stated to Merrigan, "You

know very well he [Moreland] was lying to you. Yet you stood there and allowed him to steal money from me. Why?"

74. Merrigan replied, "I have probable cause to believe that you took something from him. Here's why: First of all, I have no way of confirming your story and you weren't being very cooperative. I asked you to tell me where the homeowner was, and you kept saying that you belong here. And when you finally told me where she was, you refused to call her. When you called her, you couldn't get me on the phone with her. When I asked you to leave, you refused. So you can't blame me for taking his word over yours. Now I let you hold onto most of your stuff, so you should be happy with what you have. Maybe this will teach you a lesson not to talk back to cops."

75. Mr. Obele complained, "How do you intend to make sure I get home? You stole my wallet and gave it away. All my money was in it, including my T [MBTA] pass! At the very least, you need to have someone drive me home." Officer Merrigan laughed as he walked away, "Sorry kiddo. You're on your own!" and proceeded to enter his vehicle.

76. Officer Merrigan forgot that Mr. Obele still had Ms. Thayre's keys on him. He therefore had an opportunity to re-enter the home and retrieve what rightfully belonged to him.

77. When Mr. Obele entered the home, upon seeing him, Moreland yelled at him to get out and accused him of returning to fight, saying, "You came back to fight me for your wallet, huh? So now you wanna start shit don't you?" It is true, Mr. Obele did confront Moreland about stealing his wallet along with his cash, but he tried to reason with him and simply asked for it back. He also promised to leave if Moreland returned the wallet.

78. At that point, Moreland shoved Plaintiff Obele against the sink. Mr. Obele insisted that Moreland not touch him, or else he would be compelled to restrain him. Moreland

continued being confrontational, stating "You think because you're bigger than me, that I'm gonna let you scare me, huh? Think again!" When Moreland attempted to push Mr. Obele once more, Mr. Obele wrapped his arms around him and wrestled him to the ground. Mr. Obele was, indeed, able to use his size advantage to overpower Moreland (though Mr. Obele refrained from using any more force than was absolutely necessary to restrain Moreland and keep himself safe).

79. While Mr. Obele locked arms around him, Moreland kept trying to hit him, "I won't let you beat me. Just watch, I'ma fuck you and your girlfriend up, the second I get a chance!" Plaintiff Obele assured him he would let him go if only he agreed to stop fighting, and that there was no need to put up a fight over things that did not even belong to him. At that point, Moreland bit into Mr. Obele's finger and kept biting into it, even after Mr. Obele told him to stop.

80. During the time that Moreland bit into Mr. Obele's finger, Mr. Obele was compelled at that point to bite into Moreland's back (though Mr. Obele recalls only doing this once). This was the only way Mr. Obele knew how to get Moreland's finger out of the grip of his jaw. As Mr. Obele pulled his hand away from Moreland, Moreland was able to get up from the ground and tried to grab one of the heavy, glass water bottles by the kitchen sink. Mr. Obele was fortunate enough to grab Moreland by his pants and pull him back towards the ground before Moreland had a chance to use that weapon against him.

81. While overpowering him, Mr. Obele had ample opportunity and means to inflict more damage to Moreland's body, but withheld from doing this, because he never intended to hurt him. On the contrary, he tried using his words to get Moreland to stop fighting him.

Eventually, the injuries Moreland sustained (one bite mark, and minor lacerations on his back) did not rise to the level of severity that required him needing to go to the hospital.

82. Even after Moreland mauled Mr. Obele's finger, Moreland gave Moreland a second opportunity to stop fighting him. Moreland kept saying, "You wanna start shit, huh? You wanna start shit, don't you?" After a few minutes of engaging in an altercation, Moreland finally realized he could not prevail. At that point, Moreland started yelling, "Police! Help! He's murdering me!" At that point, Mr. Obele realized it was hopeless to calm Moreland down, so he decided to let him go.

83. Mr. Obele decided to call 911 and report that an assault had taken place, and that he was bleeding profusely.

84. Mr. Obele was fortunate Moreland had left Mr. Obele's wallet on the kitchen table. Mr. Obele quickly retrieved what was rightfully his, and then went to the front door, expecting officers to show. He left the door wide open so they could see him and not be frightened. He also got down on his knees with both hands up, to show that he posed no threat. The officer who showed up did not seem concerned about any danger Mr. Obele posed. He asked Mr. Obele to stand up so he could examine Mr. Obelef's injury. He saw Mr. Obele bleeding and called for a paramedic to appear. Soon afterwards, more officers arrived on scene. Several of them were concerned about the amount of blood dripping from Mr. Obele's finger. Mr. Obele asked one of the officers to get a napkin and some ice from the fridge to help seal the wound. Yet one of the officers who arrived, was none other than Officer Merrigan. Officer Merrigan was unconcerned about Mr. Obele's injury and simply confronted him, "I told you not to come back. I was letting you off the hook

for trespassing, but you came back and disobeyed me anyways! I should've arrested you when I had the chance!"

85. Still furious at Officer Merrigan, Mr. Obele ignored Merrigan and refused to talk to him, telling the officers, "Please get him away from me!" The officers did not think much about this remark. They took pictures of Mr. Obele's injury and kept questioning Mr. Obele about what occurred. Mr. Obele was cooperative with all the officers, but refused to engage with Officer Merrigan. At the time, Mr. Obele chose to withhold the full details of his interaction with Merrigan, including Merrigan's unlawful treatment of him and how he facilitated the theft of Mr. Obele's wallet. This was, in part, to keep himself safe from retaliation.

86. When asked why he returned to the home after leaving, Mr. Obele simply indicated that he went to retrieve his girlfriend's cell phone. The officers suspected that Mr. Obele was withholding information. One of them stated, "Your explanation doesn't hold up. Why did you come back after leaving? And why would you suddenly choose to fight him after we [the police] had just left?" But as long as Merrigan was present on the scene, Mr. Obele declined to explain what actually took place.

**November 4- 5 incidents**

87. On November 3, 2017, Mr. Obele received a call from Ms. Thayre. She mentioned not being able to sleep for several hours during the past two nights. She described feeling increasingly afraid of Moreland. She reported hearing Moreland arrive late at night on at least three occasions that week, coming home angry and agitated, and shouting profanities inside his room. At first, she was led to believe that he might have been speaking to another individual. But later that week, she discovered that Moreland was

speaking to himself the whole time, clearly being upset and agitated over something unclear.

88. Ms. Thayre told Mr. Obele that Moreland's erratic behavior was keeping her awake and frightened. So she asked Mr. Obele to spend the weekend with her. He agreed to help her and came over that Friday night with his belongings.

89. On November 4, Mr. Obele had a gut feeling that something was going on inside Moreland's room. He went into the living room outside of Moreland's bedroom and overheard Moreland speaking on the phone. Mr. Obele could hear Moreland tell someone on the phone, "Someone who tried to kill me is here." He also gave his name and the address to the person on the phone.

90. Mr. Obele went back into the guestroom to inform Ms. Thayre that Moreland might be calling to alert the police about him. Minutes later, they witnessed Moreland exit the house. Whereupon Mr. Obele looked outside the window to see Moreland speaking to two policemen on the street.

91. Ms. Thayre and Mr. Obele decided to go outside and talk with the officers. Ms. Thayre mentioned how afraid she was and how she was unable to sleep. She reported to the officers that Moreland made threats towards her the previous week and had been involved in an altercation with Mr. Obele.

92. When told about Moreland's tendency to shout and yell while in the hallways and inside his room, the Officers appeared unconcerned about Ms. Thayre's safety. One of the officers stated, "Who cares if he [Mr. Moreland] gets angry. It's also his home also and yelling isn't a crime! He's allowed to be angry."

93. At some point, the officers explained why Moreland had contacted them. They stated that Moreland wanted to go out, but he called the police to mention that he wanted to avoid having another altercation with Mr. Obele. Ms. Thayre responded, "That's great! I don't want anyone fighting in the home either."

94. The Officers informed Mr. Obele that he would receive a summons to appear in court for the October 30 altercation. Nonetheless, the officers reassured Mr. Obele that this did not prohibit him from being inside Ms. Thayre's home. Ms. Thayre emphasized that Mr. Obele was there at her request, because she wanted to feel safe. With no one else to protect her, she was relieved to hear that Mr. Obele could legally remain inside the home, despite the summons.

95. Later that evening, around midnight, Moreland returned to the condo. He was in the hallway and was greeted by Ms. Thayre. Moreland did not respond to her. At the time, Mr. Obele was sitting at the dining room table working at his computer. When he saw Mr. Obele, Moreland glared at him for a moment. Moreland then angrily entered his bedroom and soon began speaking loudly in an angry tone.

96. Both Ms. Thayre and Mr. Obele drew nearer to Moreland's room. While Ms. Thayre stayed in the hallway, Mr. Obele went into the living room next to Moreland's room. Mr. Obele took out his cell phone and began writing as fast as he could, transcribing Moreland's words in real time as he spoke. This is what Mr. Obele heard Moreland say (see Exhibit A):

> "I'm [gonna] fucking kill you. Fuck you and your white bitch. I will fucking kill you. I'm [gonna] keep my shit and my fucking gun. I will murder you.  I will merk you. I will murder your fucking dumbass. You are not gonna touch me

again. I will take your ass out...You and your white bitch. I will murder. I have a

gun. But I ain't gonna shoot you. I'll probably stab you."

97. Both Ms. Thayre and Mr Obele were horrified by these violent and detailed threats. There

was no doubt in their minds that Moreland was referring to both of them when he spoke

of murder, a "white bitch," and of guns and knives.

98. Right after recording these words, Mr. Obele ran down the hallway and stated to Ms.

Thayre, "He says he has a gun! What should we do?" Ms. Thayre said that they should

leave the apartment immediately. Mr. Obele began putting on his shoes and jacket. Ms.

Thayre ran to get her pocket book, keys, and phone. They both exited down the back

stairs, got into the car, and decided to drive away to a nearby location in order to call the

police.

99. Initially, Mr.Obele called the non-emergency number. When someone answered, Mr.

Obele tried to explain what happened but was placed on hold. At that point, Mr. Obele

hung up and called 911. 911 transferred Mr. Obele back to the Brookline police, who told

him it was a busy night and that they would come as soon as they could. At that point,

Mr. Obele and Ms. Thayre decided to drive back to the condo parking lot and wait for the

police to arrive. They both sat there for a short while when Ms. Thayre suddenly realized

that she had left her computer upstairs inside the condo. She feared that Moreland would

do something to either steal or damage it, since it contained many important legal

documents relating to the eviction. So Ms. Thayre jumped out of the car and went to

retrieve her computer. Mr. Obele began chasing after Ms. Thayre and yelled at her not to

go upstairs into the condo, fearing that she might be harmed by Moreland. Mr. Obele

grabbed Ms. Thayre by the arm, and she resisted. At that point, Mr. Obele called 911 a

second time, stating that he was trying to prevent his girlfriend from returning to the condo, and that the police needed to hurry up. Mr. Obele kept on yelling at Ms. Thayre not to go upstairs. When Ms. Thayre heard the 911 dispatcher, the dispatcher told her "Ma'm, do not go upstairs! If he [Moreland] says he has a gun, you need to stay where you are. I'm notifying the police, and they will be on their way soon."

100.     When the police arrived, Mr. Obele was met by Officer Boris Vragovic, who asked him what had happened inside the condo to make them so afraid. Mr. Obele reported that he and Ms. Thayre overheard Moreland make violent, graphic threats directed at them. Mr. Obele also shared with Office Vragovic the text message he wrote, transcribing what he heard Moreland say (see Exhibit A).

101.     The officers on scene called Moreland, and Moreland agreed to cooperate with them. The police officers sent a search team inside Moreland's room, and recovered no gun, but they did locate one or more knives.

102.     Initially, Vragovic was unaware of the age and racial difference between Mr. Obele (who is Black, and was 27-years old) and Ms. Thayre (who is White, and was 73-years old). Yet when Vragovic saw the couple together, he gave them disdainful looks and treated them in a very disrespectful manner.

103.     At one point while talking to Mr. Obele, Vragovic had the temerity to ask him, "What business do you have being with someone her [Ms. Thayre's] age? Don't you think that's a little weird?" Vragovic then questioned Mr. Obele about Ms. Thayre's finances, and whether Mr. Obele's sole purpose in dating Ms. Thayre was to exploit her financially. When Mr. Obele indicated that he was offended by Vragovic's line of questioning, Officer Vragovic inappropriately joked about interracial relationships. He

state, "Chill out. I'm just saying, not too many brothas [Black men] I know are dating White women who look like that, unless they're hoping to get in on some serious inheritance money."

104. While on the scene, Mr. Obele also overheard Officer Vragovic talking to Lieutenant John Canney, referring to Mr. Obele in unflattering terms as a "granny-fucker" and "gold digger." Vragovic also began discussing Mr. Obele's supposed lack of credibility as a witness, stating, "I don't trust that guy's word. If a person is desperate enough to date someone more than twice their age, there's no telling what else they might do to get someone in trouble."

105. Officer Vragovic informed Ms. Thayre and Mr. Obele that the police had found no gun in Moreland's bedroom. Ms. Thayre asked, "What about knives?" Officer Vragovic told her that knives were not illegal. At that point, Mr. Obele said, "But he [Moreland] specifically said he was going to stab us with a knife! Didn't you see what I wrote?"

106. Officer Vragovic replied, "We questioned him [Moreland]. He was cooperative. We searched him and his room. There were no guns. Yes, he might have said he was going to stab someone, but knifes aren't illegal, so there's nothing we can do about that. Besides, you can't be sure he was talking about you, because the door was closed. For all we know, he could have been reciting rap lyrics."

107. Mr. Obele was shocked to hear Officer Vragovic's suggestion that Moreland was simply reciting rap lyrics. He stated, "But he [Moreland] looked right at us and went into his room and started saying things he wanted us to hear. There was no rap music in the background. And he was clearly very angry at us."

108.     Officer Vragovic replied, "But he [Moreland] didn't mention you by name, so there's nothing we can do. Besides, why are you even here? You don't live here. You should stop getting yourself into this."

109.     Mr. Obele replied, "My residence status has nothing to do with this. It is a crime in Massachusetts to threaten violence against someone. You've got to do more than just shrug this off."

110.     At that point, Officer Vragovic accused Mr. Obele and Ms. Thayre of fabricating the entire incident, stating "I don't believe you all are scared. I think you want to use us to get this guy evicted."

111.     Mr. Obele replied, "No sir, we're not asking you to evict him. I want you to treat this as a criminal matter. We are frightened by the things he has said in our presence. Please help us!"

112.     Officer Vragovic replied, "We did what we could." Officer Vragovic then shifted the focus away from Moreland's graphic threats and put it back on Mr. Obele, stating, "Just stay out of this! You assaulted this guy before. You should just leave him alone."

113.     Mr. Obele denied ever assaulting Moreland, and insisted that he was defending himself after Moreland attacked him. Officer Vragovic replied, "We know you have something against him [Moreland]. I get it, you want to protect your girlfriend. But we're tired of coming out here. So just stay out of this."

114.     Mr. Obele was once again outraged by the lack of concern shown for his Ms. Thayre's safety. At some point after November 5 incident, he decided that him and Ms. Thyre needed to reinforce their alarm system, by purchasing additional video cameras to monitor the home. Mr. Obele was hopeful that should Moreland make any further threats,

they might be recorded on video camera and be available as evidence to show to the

police, who seemed to be persistently skeptical and doubtful of the threats posed by

Moreland.

115.     At some point, between November 3 and November 18, Mr. Obele was at his

parent's home in Boston when he received an alert on his phone, indicating that someone

had opened the front door. He observed from his phone Ms. Thayre exiting through the

front door and leaving the door wide open. He then watched and waited for Ms. Thayre to

return, and when she failed to return after thirty minutes, he suspected that something was

wrong. So he decided to call the police and request a wellness check. After some length

of time, an officer arrived and found Ms. Thayre speaking to Michael Desario from the

Elder Care Unit of the Brookline Police Department. Apparently, Ms. Thayre had been

speaking to Officer Desario about the threats that Moreland had made and other concerns

about her living situation with him. Mr. Obele was relieved to hear that nothing bad had

happened to Ms. Thayre, who explained to him over the phone why she did not come

upstairs. To his recollection, however, this was the first time Mr. Obele had ever had to

request a wellness check, and this incident indicates the general state of fear Moreland

had created for him and his girlfriend.


**November 18 incident**

116.     On the evening of November 17, Ms. Thayre and Mr. Obele were in the kitchen

eating dinner, and they didn't want the camera sensor to disturb them. They had a habit of

shutting the camera off during evenings because of frequent activity in the kitchen for

cooking, eating, and studying. They were supposed to turn the camera back on before going to bed, but had forgotten to do so.

117.　　Early morning on November 18, around 6 am, Mr. Obele and Ms. Thayre had been sleeping in the guest room. Mr. Obele happened to have been woken up by the sound of Moreland walking in the hallway. After Moreland walked by the guest room, he entered the bathroom.

118.　　At the time, Moreland had a habit of waking up early and wearing heavy boots in the home that made noise. Ms. Thayre had asked Moreland repeatedly to wear less heavy shoes to soften his footsteps and not disturb their sleep. But Moreland refused to listen to her.

119.　　After Mr. Obele was awakened by the sound of Moreland's footsteps, Mr. Obele suddenly remembered that he needed to activate the kitchen camera. Mr. Obele woke Ms. Thayre up to let her know he was going to turn the camera back on. And because the kitchen is directly adjacent to the guest room, Mr. Obele did not have to go far.

120.　　During the time he entered the kitchen to turn the security camera back on, the kitchen was enitrely empty. The kitchen camera is activated exactly at 6:03:54 am and shows Mr. Obele walking across the room and entering the pantry area. As Mr. Obele later indicated to police, Moreland was not occupying the kitchen when Mr. Obele first entered it, and the footage shows that.

121.　　Mr. Obele was not intending to come across Moreland nor did he seek him out.

122.　　Days earlier, Mr. Obele noticed that the camera was not in the proper location to detect movement by the rear door. He tried, on several occasions, to convince Ms. Thayre to let him position the camera loser to the rear door. When Mr. Obele had the chance to

act on his own advice, he went to look for the kitchen stool to place the camera on it, and

adjust it if necessary. At that point, he returned to the kitchen and unplugged the camera,

intending to move it closer to the rear door. When he could not find the kitchen stool, he

went to the guest room to wake up Ms. Thayre a second time. Ms. Thyre told him she

needed to use the stool for one of her plants. Mr. Obele went looking for the stool in the

sun room, also adjacent to the kitchen, where Ms. Thayre keeps her plants. Still unable to

find the stool at that point, he instead used the folding table Ms. Thayre had left there.

123.     Both times Mr. Obele was in the kitchen, it was completely empty. He was not

expecting Moreland to be there when he returned to the kitchen. And Mr. Obele was

intending to return to bed immediately once he finished relocating the camera closer to

the rear door.

124.     When Mr. Obele exited the sunroom and entered the kitchen, he saw Moreland.

Moreland was using the kitchen sink. Moreland was startled to see Mr. Obele and said to

him, "I thought you weren't supposed to be here." Mr. Obele did not engage with

Moreland or speak to him.

125.     Mr. Obele tried to walk past Moreland. As Mr. Obele drew near, Moreland

responded loudly "Come up off yo" which is slang for, "Watch out! Don't come near

me!"

126.     Mr. Obele stopped walking. Moreland began speaking again, stating "Man you're

just fucking, you just, you just wanna start shit don't you?" By that point, Moreland

began angrily storming out of the kitchen into the pantry. As he walked away, Mr. Obele

tried to tell him in a calm voice,  "You can use it [the kitchen] when I'm done." This is

the only thing that Mr. Obele said during the short time that Moreland was there with him.

127.    Mr. Obele proceeded to walk into the pantry and quietly set up the table near the rear door, as he intended to do all along. He waited for Moreland to exit first then went into the pantry to set up the folding table he was carrying.

128.    It is worth noting in the recording, that Moreland  is not responding verbally to any pain, surprise, or harm that is being inflicted on him (e.g. "Ouch! Don't hit me!" "Stop hitting me!" "Why are you hitting me?"). There is no indication of an altercation or any physical contact between Mr. Obele and Moreland. The footage records Moreland being angry and shouting profanities, but he made no mention of a table or ever being attacked. Moreland seemed to believe that Mr. Obele was intending to attack him, but he said nothing at all to indicate that Mr. Obele actually did.

129.    While this all transpired, Ms. Thayre heard Moreland's voice from the kitchen, saying to Mr. Obele,  "I thought you weren't supposed to be here." Ms. Thayre jumped out of bed and into the kitchen in a matter of seconds intending to speak to Moreland. However Moreland was already walking rapidly from the kitchen into the pantry, and on out to the dining room, muttering a long string of profanities.

130.    According to Ms. Thayre, there was no indication that an attack of any kind had taken place in the kitchen or in the pantry. Ms. Thayre witnessed no visual or verbal sign of any struggle, or anyone being hit, nor any attempt to prevent Moreland from going to his room. Moreland did not mention the word, "table" nor did he mention being "hit" or "struck" by anything before he left.

131.     Once in his room, Moreland decided to return with a cell phone and his water bottle, perhaps thinking Mr. Obele would still be alone. When he entered the kitchen, he saw Mr. Obele and Ms. Thayre.

132.     Before Ms. Thayre and Mr. Obele had a chance to talk to him, Moreland already began alleging that Mr. Obele was "fucking" with him. This was also the first time Moreland ever mentioned the word, "table," indicating that Mr. Obele had "bumped" into him with it. Moreland then threatened to call the police in Mr. Obele ever tried to appraoch him again. Mr. Obele replied, " I didn't do anything wrong."

133.     After the initial encounter with Mr. Obele in the kitchen, Moreland did not seclude himself and call the police as one would expect from someone in fear for his safety. Instead, he returned to the kitchen with his cell phone and water bottle (perhaps thinking he would be alone with Mr. Obele) and began making accusations and insults towards Mr. Obele, while repeatedly threatening to call the police.

134.     If Moreland was maliciously attacked by Mr. Obele, as he later alleged, then it is unlikely that he would have been reckless enough to return to the kitchen a second time — not knowing for certain whether he would still be alone with Mr. Obele.

135.     Ms. Thayre tried to indicate to Moreland that Mr. Obele was allowed to be in her home. At that point, Moreland turned around and then immediately headed back into his room, still ranting. Ms. Thayre followed him still trying to understand what was rose to the urgency of needing to call the police. Mr. Obele followed her as she walked towards Moreland's door. Moreland opened his door and began talking to Ms. Thayre, while Mr. Obele stood away from him at a distance. According to the video footage, the following exchange occurred between 6:09:54 am and 6:10:56 am:

**Ms. Thayre:** Well the - and

**Moreland:** Get your - Get your animal away from me, okay? Before I call the police. I'm gonna call them!

**Ms. Thayre :** Who's the animal right now? That's what I want to know

**Moreland:** I'm gonna call them, I got the number right here.

**Ms. Thayre:** I just wanna know who -

**Moreland:** I'm gonna record this. I'm gonna record this.

**Ms. Thayre:** You know you gotta stop doing this, because you're making -

**Moreland:** I'm gonna record this.

**Ms. Thayre:-** you're making a fuss when you don't need to make a fuss

**Moreland:** Can you please get him away from me?

**Mr. Obele:** I am not doing anything

**Moreland:** You better not. I'm gonna get some water you have - you better not touch me.

**Mr. Obele:** I am not doing anything

**Moreland:** Or else I'm gonna call the police on you.

**Mr. Obele:** Whatever. Whatever

**Moreland:** I got - I got you on camera. I got you on camera.

**Mr. Obele:** Do you see him? - I just walked into the kitchen and he freaked out.

**Moreland:** I'm gonna get water. I'm gonna get water

**Mr. Obele :** What are you talking about? We have a -

**Ms. Thayre:** [to Moreland] Okay, that's fine

**Moreland:** Don't touch me. Don't touch me. You're being recorded.

**Mr. Obele :** No no no no. No no no no

**Moreland:** You're being recorded.

**Ms. Thayre:** You're always saying he's touching you. You're  always seeing he's touching you and he's not touching you.

**Mr. Obele:** oh no no no no no I am not touching you.

**Moreland:** Nah nah nah you know what you did.

**Mr. Obele:** I am not touching you

**Moreland:** You know exactly what you did and I know what you did too!

**Ms. Thayre:** [to Mr. Obele] C'mon, okay, let's go back

**Moreland:** You're being recorded. You're being recorded

**Mr. Obele:** [to Heleni] Can you tell him, to let me finish using the kitchen?

**Ms. Thayre:** [to Mr. Obele] Okay, Okay I will - [to Moreland] What is it that you need to do in the kitchen?

**Moreland:** [to Chiuba] You're being recorded.  And I'm gonna call the police if you try to put your hands on me. I will call the police.

**Mr. Obele:** I did not put my hands on you.

**Moreland :** N - no you didn't, you didn't you didn't, but you tried

136.     In between the time Moreland first saw Mr. Obele, came back to the kitchen to

confront him, and then spoke to Ms. Thayre outside his doorway (while Mr. Obele

remained at a distance) he never tried to report his accusations to the police, even though

he had several opportunities to do so. He could have easily locked himself in his room

and kept himself safe until police arrived to help calm the situation. But he made no effort to do so. The entire time, he seemed to be expecting a fight to break out, and when that fight never came, he remained fixated on recording Mr. Obele with his cell phone, even though Mr. Obele posed no threat to him.

137.     When Ms. Thayre tried to talk to him, Moreland barged out of his room with his cell phone open, trying to record Mr. Obele as he moved towards my direction. Moreland stated, *"You better not touch me."* Ms. Thayre responded, "*He* [Mr. Obele] *is not touching you."* And Mr. Obele replied as well, *"no no no no no, I am not touching you."*

138.     At no point, did Mr. Obele ever try to physically prevent Moreland from using the kitchen. Moreland was obsessed with the notion that Mr. Obele was only there to fight him, and he even goes on to acknowledge that no actual assault ever occured, stating **"N - no you didn't, you didn't you didn't [put your hands on me], but you tried."** This ordeal began because Moreland was simply startled to see Mr. Obele in the kitchen, and was obsessed by the idea that Mr. Obele was only there to fight him. Yet at the very moment where Mr. Obele denied ever putting his hands on him, Moreland openly acknowledged there was *never* any attack that took place in the kitchen, nor physical contact of any kind.

139.     It is doubtful that Moreland could have meant the literal use of "hands" to describe his initial encounter with Mr. Obele, since he failed to report to police any attempt by Mr. Obele to punch or grab hold of him. Furthermore, Ms. Thayre witnessed seeing Moreland quickly walk out of the kitchen before there was time for anything else to happen. In that short span of time (from the second she heard Moreland's voice to the moment she arrived and saw him leaving) it is unlikely that Mr. Obele would have had

the opportunity to make an attempt to harm Moreland using his "hands" without being heard or seen by Ms. Thayre as she walked in. We must therefore conclude that when Moreland acknowledged that Mr. Obele did not "put his hands" on him, he specifically meant there was no contact made between himself and the table Mr. Obele was holding, but feared that Mr. Obele might try to use it to harm him.

140.    After being cut off, the video footage then continues to run between 6:11:06 am and 6:12:09 am. The following exchange took place:

**Moreland:** If you dare fuck with me -

**Mr. Obele:** I did not -

**Moreland**: If you ever put your hands on me, I'm gonna call the police

**Mr. Obele**: I did not put my hands on you. What are you talking about?

**Ms. Thayre**: This is why I need to be here.

**Moreland:** Yeah that's why you need to be here. Be here all the time. [*Moreland closed the door]*

**Ms. Thaye:** So what is that you um - What is that you have to do in the kitchen?

**Mr. Obele**: I was. Let's talk in the kitchen.

**Ms. Thayre:** What?

[*Ms. Thayre and Mr. Obele exit the corridor and return to the kitchen. Moreland is heard talking to himself in his bedroom*]

**Moreland:** Before this shit fucking goes down, I'ma just call the police, cause' I ain't even do nothing. I'm just gonna call the police on this fucking nobody. That's all I'm gonna do. Fucking queer. Fucking wake up in the morning and I ain't fucking do shit. Fucking - wants to fuck with me. Fuck with me. That's the only way I can use a fucking finger on his [ ]is fucking call the police. Kill this fucking monkey. Fool me - Fool me once, you a hostage. Fucking bubble boy. Lay his ass down."

141.     As seen on the recording, Moreland can be heard behind his door talking to himself, continuing his obsession that Mr. Obele wanted to "fuck" with him and calling Mr. Obele derogatory names (e.g. "fucking monkey" "fucking queer" "fucking bubble boy").

142.     Moreland goes on to say, "That's the only way I can use a fucking finger on his [ ]is fucking call the police. Kill this fucking monkey … Lay his ass down." By making this statement, Moreland acknowledges that he wanted to involve the police and hope that Mr. Obele somehow ended up dead.

143.     The footage continues to run and shows that as Moreland continued his angry, violent rant behind his door, Ms. Thayre visited him a second time, because she wanted to keep this situation from spiralling out of control. Mr. Obele, on the other hand, never attempted to go near Moreland's doorway without Ms. Thayre being present the whole time. Mr. Obele made repeated attempts to ask Ms. Thayre to refrain from engaging with Moreland, and Mr. Obele approached Moreland's doorway only in an effort to dissuade her from talking to Moreland.

144.     While there, Mr. Obele briefly became involved in a heated exchange with

Moreland. Yet this occurred only after quietly enduring several minutes of insults and

profanities that Moreland hurled at him.

145.     Moreland made one attempt to close the door on Mr. Obele, and only very briefly

did Mr. Obele hold it open, before stepping away. Mr. Obele had no intention of forcing

his way into Moreland's room. But it was at that moment Moreland succeeded in getting

footage on his cell phone that he could use to misrepresent the overall nature of Mr.

Obele's interaction with him.

146.     No argument ever took place between Moreland and Mr. Obele inside the kitchen

or any other area of the home, except for one brief exchange outside Moreland's

doorway. Mr. Obele seldom responded to Moreland's insults, and allowed Ms. Thayre to

do most of the talking as she went to Moreland's door on two occasions, to complain

about him disturbing the home and needlessly involving the police. Mr. Obele was there

only with the intention of remaining with Ms. Thayre, and advising her not to engage

Moreland. When there was indeed a verbal altercation between the two men, it started

and ended quickly. Mr. Obele and Ms. Thayre subsequently withdrew and proceeded into

the foyer, well beyond Moreland's doorway.

147.     It is worth stressing, yet again, that Mr. Obele largely refrained from making

verbal insults towards Moreland, even as Moreland hurled insults at him like "animal,"

"monkey," "fat boy," and "pet."

148.     Moreland then walked out of his room while on the phone with 911, as Ms.

Thayre and Mr. Obele stood far away from him on the other side of the foyer. Moreland

did not try to create distance between himself and Mr. Obele when he later stood several feet outside his own bedroom door calling 911, in plain sight of Mr. Obele.

149.     On the 911 call, Moreland stated to dispatch that he was being threatened and could not leave his room because "he [Mr. Obele] is standing in the doorway and holding it open." Yet as can be seen on the video footage, Mr. Obele was nowhere near Moreland's doorway when this happened, and was not at all trying to prevent Moreland from closing his door. Nor was Moreland being threatened when he contacted 911. Mr. Obele made no attempt whatsoever to interfere with his phone call or threaten him.

150.     Moreland was clearly not in fear, since he chose to leave the safety of his room on multiple occasions and inexplicably stood outside his door to insult Mr. Obele as he spoke on the phone. This can all be seen in the footage from the security camera outside his bedroom.

151.     If Moreland was fear for his safety, one would have expected him to lock his door and keep himself secluded until the police arrived. Instead, Moreland not only chose to come out of his room on his own accord, but continued to hurl insults at Mr. Obele as he spoke. All the while, Mr. Obele remained silent, and never kept Moreland from walking around.

152.     After threatening to call the police for a variety of reasons which changed and developed over time, Moreland did eventually call the police on his cell phone. Mr. Obele and Ms. Thayre were puzzled by this, because they considered most of Moreland's accusations to be either frivolous or simply false, a product of his fears or his imagination rather than something that actually took place.

153.     When Officer David Pilgrim arrived, he instructed Moreland to head downstairs with the other officer present. Officer Pilgrim then approached Ms. Thayre and Mr. Obele while they stood in the foyer.

154.     Officer Pilgrim questioned Mr. Obele about what happened. Mr. Obele told Officer Pilgrim that he had left the kitchen moments before encountering Moreland. The kitchen was entirely empty when Mr. Obele first got there. As Mr. Obele was retrieving a folding table from the sunroom, Moreland must have entered the kitchen to fill his water bottle. When Moreland saw Mr. Obele coming from the sun room, he was startled, and then immediately became angry. He began swearing at Mr. Obele and set off toward his room saying "You just wanna start shit...I might just call the police right now." Officer Pilgrim seemed unconvinced, saying "Something obviously must have happened to make him so upset. Are you sure that's the only thing that initiated this disagreement?" Mr. Obele replied, "Yes. I am sure. "

155.     Mr. Obele then went into detail about his time by Moreland's door, and mentioned that he only argued with him briefly, after Moreland spent several minutes confronting Ms. Thayre and Mr. Obele about his accusations, which they both knew to be false. Mr. Obele told Officer Pilgrim about the insults and profanities Moreland used towards him. He also mentioned Ms. Thayre being present throughout this entire time. Ms. Thayre confirmed that she did indeed witness the entire exchange and never left Mr. Obele to be alone with Moreland.

156.     Though Pilgrim would later try to charge Mr. Obele with 'Witness Intimidation,' after he allegedly pursued Moreland and kept him from closing his door, Pilgrim did not actually question Mr. Obele  about his interactions with Moreland by the doorway. He

also failed to question Ms. Thayre about what she witnessed. For the remainder of the morning, Pilgrim focused solely on Mr. Obele's motives for wanting to use the kitchen, and he refused to accept that Mr. Obele could have been there alone.

157.    When Mr. Obele finished speaking, Officer Pilgrim left to head downstairs to speak to Moreland. Mr. Obele and Ms. Thayre waited for several minutes. When Officer Pilgrim returned, he started saying that he had doubts about Mr. Obele's reasons for waking up. He asked, "What were you doing up? Why did you feel the need to suddenly go into a kitchen with someone you have problems with?" Pilgrim then stated that it "made no sense" that Mr. Obele would choose this time of day to "randomly" wake up just as Moreland was using the kitchen.

158.    Officer Pilgrim continued saying, "Why would you feel the need to just suddenly decide to bring out a table for no good reason? Can you please explain that?" Mr. Obele again tried to correct the officer, stating, "Sir, the kitchen was completely empty. I went inside here to activate the security cam. I know how the camera is supposed to work. I worked for the company that manufactured it. I just wanted to move it where I felt it needed to be. I did not expect to run into Talib [Moreland] when I came out of the sunroom."

159.    Mr. Obele offered to show Officer Pilgrim the table as well as the camera, which was already turned off at that point. Officer Pilgrim spent a brief time asking Ms. Thayre about her whereabouts during the incident. Ms. Thayre reported hearing Moreland's first words to Mr. Obele that morning, and she stated directly, "I was awake when I heard Talib [Moreland] say to Chiuba, 'You're not supposed to be here.' Talib knows that isn't true. So I decided to get up and talk to him."

160.     Ms. Thayre stated that when she entered the kitchen seconds after first hearing

Moreland, he was seen already exiting through the pantry. Ms. Thayre also indicated that

she arrived in time to witness Mr. Obele entering the pantry. She watched as Mr. Obele

began placing the table down by the rear door. Moreland and Mr. Obele were separated

by at least two or three yards, because Moreland started heading out towards his room

almost immediately after seeing Mr. Obele.

161.     When Mr. Obele and Ms. Thayre were finished speaking, Officer Pilgrim turned

and looked around the pantry and then came back to question Mr. Obele. His line of

questioning was yet again, fueled by persistent doubt about Mr. Obele intentions, stating,

"Assuming she was awake to see you here — and I'm having a hard time believing she

even was awake to see anything — why would you want to bring a table near him

[Moreland] in such a confined area, knowing that you'd hit him?"

162.     Mr. Obele had to correct Officer Pilgrim yet again, "Once again, you got it all

wrong. I never said we were in the pantry together. I didn't even have a chance to go near

him. This started when he [Moreland] saw me coming from the sunroom. He got angry

and walked out the kitchen immediately after seeing me" Nonetheless, Officer Pilgrim

kept raising the question, "What reason did you even have to be in the kitchen? Didn't we

tell you that you shouldn't come here until this guy is gone?" Mr. Obele again answered,

"I didn't expect to encounter him. I told you he was using the bathroom. He was there for

a decent amount of time, while I walked in and out of the kitchen, trying to find a surface

to use. I went to this room [the sunroom] to find anything I could use to set up this

camera. When he saw me coming from the sunroom, I hardly had a chance to walk in

before he freaked out and left."

163.    Officer Pilgrim let Mr. Obele and Ms. Thayre remain in the kitchen and left to go

downstairs. Officer Pilgrim returned with his superior (Officer Raskin) who began asking

the same question about why Mr. Obele wanted to use the kitchen. He demanded that Mr.

Obele offer an explanation, stating, "Tell me the truth! Why would you come out here,

when you had the opportunity to wait for him to leave?"

164.    Mr. Obele told Officer Raskin exactly what he told Officer Pilgrim, stating, "The

kitchen was empty when I got here, sir. Talib [Moreland] was on the other side of the

house. I must've walked in and out of here at least two times before he was anywhere

near me." Officer Raskin asked whether Mr. Obele could have possibly hit him by

accident. Mr. Obele clarified, "No. There was never any contact between us. I was

leaving the sun room. Once he saw me stepping into the kitchen, he got upset and left

before I had a chance to go near him."

165.    Officer Raskin then asked Ms. Thayre where she was. She pointed directly to the

guest bedroom, just a few feet away. Ms. Thayre brought Officer Raskin inside the

bedroom. Officer Pilgrim followed them. She told both officers that she heard

Moreland's footsteps coming down from the hallway directly from the bathroom. Mr.

Obele saw Ms. Thayre walk both the officers down the hallway to the bathroom.

166.    When Officer Raskin returned to question Mr. Obele, Mr. Obele had to repeat

again that he was not expecting to encounter Moreland in the kitchen, since it was

completely empty when he got there. He entered the kitchen to plug in camera, and then

walked across the room into the pantry, seeking a closer vantage point to observe the

back door. He then unplugged the camera and went looking for the kitchen stool. He

went back inside the guest bedroom to ask Ms. Thayre where he could find the stool. Ms.

Thayre told him to search the sunroom, also adjacent to the kitchen. In order to get to the sunroom, Chiuba had to go back inside the kitchen a second time, and still found it completely empty. When he could not locate Ms. Thayre's stool, he returned to the kitchen with a small folding table, expecting it to remain empty.

167.    Officer Raskin left to question Moreland, who was presumably still waiting downstairs. During that time in which Ms. Thayre and Mr. Obele remained in the kitchen with Officer Pilgrim, there was only the three of them. Ms. Thayre asked if she could use the bathroom, and Officer Pilgrim allowed her to leave. When Mr. Obele was alone with him, Pilgrim told him, "You know none of what she's telling me is making any sense. We all know you have no legitimate reason to be dating this old lady. We're all trying to figure out why you're with her!"

168.    Mr. Obele looked at Officer Pilgrim and remarked angrily, "Who I love isn't any of your business!"

169.    Officer Pilgrim replied, "Settle down, weirdo. I don't believe a single word she [Heleni] says. Old people love to sleep. They don't wake up that easily. She couldn't have been awake to see or hear anything."

170.    "What are you talking about?" Mr. Obele replied, "She told you she woke up and didn't see me do anything wrong. Are you just gonna refuse to believe her?"

171.    Officer Pilgrim replied, "Okay, so she says she was awake, but how can I be so sure of this? She sounds confused and uncertain anytime we ask her basic questions. She can't ever stay on topic. I suspect she has some kind dementia. So it's basically just his [Moreland's] word against yours."

172.	Pilgrim was clearly not wanting to believe Mr. Obele's story. He didn't want to believe that Mr. Obele could've been alone in the kitchen by himself. Nor did he want to accept Ms. Thayre's testimony, though she was undeniably awake to hear Moreland speak and witness nearly everything that occured that morning. Anything that contradicted Moreland's account of the incident or anything that did not align with his ageist views, were never taken seriously by Officer Pilgrim and the other officers.

173.	At that point, Mr. Obele suddenly remembered having access to the security camera, and he suspected that there may be enough there to convince Officer Pilgrim that Mr. Obele was telling the truth. And if Officer Pilgrim gave him a chance to retrieve his cell phone, perhaps Mr. Obele could corroborate at least part of his story.

174.	Mr. Obele asked Officer Pilgrim if he could share this video footage with him. There was a brief pause, and at that moment, Officer Pilgrim responded, "I don't want to see your security footage. You disrespected us when you came back after we told you to leave this house. I don't want to hear anything else you have to say. And you better not leave my sight"

175.	Perhaps thinking that Mr. Obele would try to flee, Mr. Obele asked Officer Pilgrim if he was willing to escort him as he went to retrieve his cell phone. Officer Pilgrim replied, "You're not going anywhere. You were trespassing and disobeyed us when we told you not to come back [referring to the October 30 incident]. But you just keep coming back here. This will teach you to keep your nose out of places where you don't belong!"

176.	Mr. Obele replied, "Trespassing? Why are you talking about trespassing? Just let me get my phone! Do you not even care what actually happened?"

177.     Pilgrim responded, "No, I already know what happened. I just don't care what you have to show me. I'm not gonna let you share footage with anyone. And if you try to move, I'll put these handcuffs on you. When we came here last month, I specifically remember telling her [Ms. Thayre] to keep you out the house and she refuses to listen to us. Well enough is enough. We're not gonna put up with your games anymore. If she won't keep you out of here, then we're gonna arrest you and make sure you stay out of here for good!"

178.     At this point, Officer Pilgrim began clenching what appeared to be either a firearm or some kind of baton. "You better not move, because if you try to leave this room, I'll have grounds to use force against you!"

179.     Ms. Thayre returned just as Officer Pilgrim finished. Another officer appeared shortly after that. Mr. Obele was in a state of shock and disbelief about what Pilgrim told him. But like Officer Merrigan before him, he wasn't comfortable confronting him out in the open, and telling the other officers what he had heard.

180.     While sitting down, Mr. Obele turned to Officer Pilgrim and said to him, "You're a sick human being. I can't believe you are treating us this way! You're refusing to believe we have to say, because you think I'm some kind of 'weirdo.'" Officer Pilgrim ignored Mr. Obele.

181.     Officer Raskin returned to ask Mr. Obele one more time what he had done to make Moreland upset. This time he was accompanied by an unknown officer. Mr. Obele responded, "Nothing! Don't you get it? The guy just got mad at me for no reason!" Officer Raskin asked Mr. Obele again why he decided to be in the same room as Moreland. Mr. Obele replied, "I already told you the kitchen was empty. I was the first

one here. If you don't wanna believe me, then there's no point in me saying anything else."

182.     When Officer Raskin left again, Mr. Obele waited there in the kitchen with Ms. Thayre, the unknown officer, and Officer Pilgrim. Ms. Thayre said to Pilgrim "Why would you ever believe what Talib [Moreland] tells you? He is not a truthful person." Officer Pilgrim replied "None of what he [Mr. Obele] says is making sense! He needs to just leave this man alone, so we can stop coming here. Okay?"

183.     At that exact moment, several officers entered the kitchen with handcuffs in their hands. One of them asked Mr. Obele to stand up and place his hands behind my back. Mr. Obele refused, and when one of the officers attempted to put his hands on him, Mr. Obele started to resist saying "I did nothing wrong! I didn't do anything. I did NOTHING wrong!"

184.     Though the officers kept insisting that Mr. Obele stay calm and let them take him into custody, Mr. Obele was not able to comprehend what was going on. He started to scream and shout. Mr. Obele reasoned that if Officer Pilgrim was willing to threaten him, perhaps the other officers were going to do the same. Mr. Obele started to say, "I don't want to go to jail. I'd rather you just kill me. Please, just kill me!"

185.     Officer Pilgrim and the other policemen held Mr. Obele to the ground. At one point, Pilgrim threatened to shoot pepper spray directly into his eyes if he didn't stop resisting. Several other officers kept warning Mr. Obele that he would be sprayed if he kept resisting.

186.     Fearing that the pepper spray would harm her breathing, Ms. Thayre left the kitchen and continued begging the officers not to use it. While Pilgrim held the spray

canister directly in Mr. Obele's face, one of the officers told him about Ms. Thayre's health and advised him not to deploy the weapon inside her home. This appears to have convinced Pilgrim to hold back.

187.     The officers decided that Mr. Obele would have to be carried out, and at least five of them attempted to pick him up. Yet they could not hold Mr. Obele long enough to do so, while he kept moving and using his weight to obstruct them.

188.     One of the officers then went into the room where Ms. Thayrei retreated to and asked her if Mr. Obele had any history of mental illness, that could possibly explain how he was behaving. She stopped dead and said in shock "Yes! He has bipolar!" When the officers recognized this, they asked Ms. Thayre to calm him down. She calmed Mr. Obele down briefly, but then Mr. Obele became gripped by fear.

189.     Fortunately, one of the officers (who seemed very experienced in de-escalation tactics) managed to calm Mr. Obele down and explained that he would not be jailed, but would be sent directly to the hospital for his own personal safety. A team of medics came a little later and took Mr. Obele into inpatient care at St. Elizabeth's.

190.     Mr. Obele was grateful to the officers for their restraint, and told them that he was remorseful about his behavior towards them. He was especially grateful for the officer who succeeded in calming him down.

191.     When Mr. Obele got out of the several days later, he was relieved that the footage appeared to corroborate many of his claims.

192.     Mr. Obele was very pleased to discover that the camera recorded an admission by Moreland that no physical contact was ever made between him and Mr. Obele. Earlier

that morning, after confronting Ms. Thayre and Mr. Obele in the kitchen, Moreland

decided to walk out a second time towards Mr. Obele with his cell phone out, repeating

"You're being recorded. I'm going to get some water and you'd better not touch me!"

Mr. Obele attempted to withdraw away from Moreland and stated, "no no no no no, I am

not touching you." As Moreland stepped back into his doorway and insisted, "I'm gonna

call the police if you try to put your hands on me" Mr. Obele replied "I did not put my

hands on you." It was at that exact moment that Moreland responded, **"No you didn't,**

**you didn't you didn't, but you tried."** This admission by Moreland supports Mr.

Obele's claim that no assault ever took place.

193.     But Mr. Obele did not want to believe that Officer Pilgrim would threaten to

handcuff him or try to prevent me from disclosing this crucial evidence. Mr. Obele

simply refused to believe that something so disturbing could have happened.

194.     Yet when Mr. Obele later got a chance to procure Officer Pilgrim's police report,

none of what he told Pilgrim was ever mentioned or accurately described by him. Nor did

Pilgrim acknowledge the footage Mr. Obele wanted to share with him. Mr. Obele could

not understand why Pilgrim would chose to reference the cell phone video taken by

Moreland, but make no mention of the extensive security footage Mr. Obele tried to offer

him. It was especially concerning how Pilgrim completely ignored Ms. Thayre's

testimony, even though she repeatedly told him that she was wide awake during the

incident. Pilgrim was not willing to even list her as a eyewitness, choosing rather to name

her as an "other" involved person.

195.     As the responding officer on the scene, Officer Pilgrim had a duty to examine the

evidence Mr. Obele wanted to present him with. He did not seem interested in conducting

a fair and honest investigation. Not only did he ignore Ms. Thayre's eyewitness account, but he threatened to use force against Mr. Obele when he tried to present him with crucial evidence.

196.     Mr. Obele considered taking legal action against Officer Pilgrim and Officer Merrigan for violating his Civil Rights. He decided that it would be worthwhile to focus on those two officers, while researching the legal grounds to sue Officer Vragovic.

197.     On January 10, 2018, he contacted the ACLU of Massachusetts and shared details about his interactions with Officer Merrigan and Officer Pilgrim. While on the phone with a woman who recorded his allegations, she advised Mr. Obele not to pursue legal action against the officer until his criminal case was resolved. She warned Mr. Obele that pursuing legal action against the officers could result in retaliation and potentially encourage the prosecutor to be more aggressive in pursuing the charges against him. Mr. Obele replied that he would consider this advice.

198.     After speaking to the intake specialist, Mr. Obele later followed up with an email to the ACLU, stating "Thank you for taking time to listen to my situation. Below are written testimonials about the two officers who violated my Civil Rights."

199.     Several days later, on January 22, 2018, Mr. Obele received an email from the ACLU, which indicated that the organization could not assist him If criminal charges were unresolved and advised him to work closely with his criminal defense lawyer to first clear his name. The email contained a letter, which stated that, "[a] complaint or talk of a lawsuit against the police may hurt your criminal case."

200.      Mr. Obele received pre-trial probation for the Assault and Battery With a

Dangerous Weapon charge and the Resisting Arrest charge. He completed his probation

in 2019.

201.      In late 2019, Mr. Obele was not able to pursue his complaint against Officer

Merrigan and Pilgrim, because he was preoccupied with pursuing legal action against an

employer who discriminated against him and subjected him to harassment. Then

beginning in December 2019, Mr. Obele helped Ms. Thayre file a lawsuit against the

Building Commissioner and local zoning board of Brookline, relating to her short-term

rental, which was shut down by the Town. This further consumed a great deal of Mr.

Obele's personal time and energy. Presently, Mr. Obele continues to assist Ms. Thayre in

pursuing this lawsuit against the Town.

202.      Mr. Obele was prompted to initiate this lawsuit against Officer Merrigan, Officer

Vragovic, and Officer Pilgrim, because he realized that the three-year statute of limitation

was approaching. But he also was inspired by the protests against police brutality and

misconduct, inspired by the murder of George Floyd..

203.      Mr. Obele and Ms. Thayre have both suffered emotional trauma and pain from the

actions by Defendants Moreland, Pilgrim, Merrigan, and Vragovic. The time has come to

hold them accountable.

## **FIRST CAUSE OF ACTION**

### **Wrongful Search and Seizure in violation of 42 USC § 1983**

(against Defendants: Merrigan, Pilgrim, Brookline Police Department,  Town of Brookline)

204.      The preceding paragraphs are here incorporated by reference.

205.     Plaintiff has a clearly established right under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable search and seizures.

206.     Defendants have deprived Plaintiff of his civil, constitutional and statutory rights under color of law and have conspired to deprive him of such rights and are liable to plaintiff under 42 USC § 1983.

207.     The seizure of and search of Plaintiff were without reasonable suspicion, probable cause, or warrant, or any recognized exceptions thereto, or justification or excuse, and were thus unreasonable, in violation of Plaintiff's Fourth Amendment right to be free of unreasonable search and seizure.

208.     Plaintiff Obele suffered damages as a result of Defendants' conduct.

209.     The Defendants' misconduct, abuse of power, and/or improper police work was the result of improper training, supervision, control and/or discipline.

210.     The Defendants, TOWN OF BROOKLINE and BROOKLINE POLICE DEPARTMENT, pursuant to official or *de facto* policy, custom, and practice, did intentionally, knowingly, or with deliberate indifference to the rights of the Plaintiff, fail to train, instruct, supervise, control and/or discipline, on a continuing basis it officers in the performance of their duties. Thus, they are liable for Defendants' misconduct.

## SECOND CAUSE OF ACTION

### Racial Profiling in violation of 42 USC § 1983

(against Defendants: Merrigan, Brookline Police Department, and Town of Brookline)

211.     The preceding paragraphs are here incorporated by reference.

212.     Plaintiff Chiuba Obele, a Black man who had committed no wrong, was subjected

to illegal racial profiling and search of his body and belongings, made to pull up his shirt,

and had his wallet confiscated, all without just cause or reasonable suspcision.

213.     Other than Plaintiff Obele's skin color, Defendant Merrigan had no objectively

reasonable basis to believe that Plaintiff had committed a crime.

214.     Defendants' conduct deprived Plaintiff of his right to be free of racial profiling.

215.     Plaintiff suffered damages as a result of Defendants' conduct.

216.     The Defendants' misconduct, abuse of power, and/or improper police work was

the result of improper training, supervision, control and/or discipline.

217.     The Defendants, TOWN OF BROOKLINE and BROOKLINE POLICE

DEPARTMENT, pursuant to official or *de facto* policy, custom, and practice, did

intentionally, knowingly, or with deliberate indifference to the rights of the Plaintiff, fail

to train, instruct, supervise, control and/or discipline, on a continuing basis it officers in

the performance of their duties. Thus, they are liable for Defendants' misconduct.


### THIRD CAUSE OF ACTION

**Defamation**

(against Defendants: Moreland)

218.     The preceding paragraphs are here incorporated by reference.

219.     Moreland acted with malice when he expressly and falsely accused Plaintiff of

criminal conduct.

220.     Moreland knew that his statement was false and unwarranted, and recklessly

disregarded the truth.

221.     The defamatory statements made by Moreland caused irreparable harm to the Plaintiff.

## FOURTH CAUSE OF ACTION

### Malicious Prsoecution

### (against Defendants: Moreland)

222.     The preceding paragraphs are here incorporated by reference.

223.     Moreland intentionally, and knowingly made false statements to Police and caused and otherwise maintained a criminal prosecution without lawful basis against Plaintiff

224.     Moreland knew such statements were false, and such statements were made intentionally, maliciously, or with reckless disregard for the truth.

225.     Moreland intentionally made such statements in order to cause the commencement and continuation of a criminal prosecution against Plaintiff with reckless disregard of the rights of Plaintiff.

226.     The aforementioned conduct by Moreland was malicious in that Moreland gave false statements and maintained the criminal proceeding so as to cause Plaintiff harm.

227.     As a result of such conduct, Moreland caused Plaintiff to suffer a loss of liberty, humiliation and mental anguish and injury to Plaintiffs reputation, injury and inconvenience to Plaintiff caused by his arrest, expenses incurred in defending the criminal prosecution, and other compensatory damages, caused by Moreland's false statements and malicious prosecution.

## FIFTH CAUSE OF ACTION

**Deprivation of Equal Protection in violation of 42 USC § 1983**

(against Defendants: Vragovic, Brookline Police Department, and Town of Brookline)

228.    The preceding paragraphs are here incorporated by reference.

229.    The Equal Protection Clause of the U.S. Constitution holds that "[n]o State shall

deny to any person within its jurisdiction the equal protection of the laws."

230.    Plaintiff was deprived of his full and equal benefit of all laws and for the security

of persons and property, in that the Defendant officers treated Plaintiff differently from,

and less favorably than, other crime victims.

231.    Defendants deprived Plaintiff of Equal Protection of the Laws in violation of the

Fourteenth Amendment due to his race and age in relation to his girlfriend (an older

white woman) and based on age- and race-based stereotypes.

232.    As a result of Defendants' actions, Mr. Obele has been injured, damaged and

deprived of the rights and privileges afforded to him as a citizen of the United States.

233.    The Defendants' misconduct, abuse of power, and/or improper police work was

the result of improper training, supervision, control and/or discipline.

234.    The Defendants, TOWN OF BROOKLINE and BROOKLINE POLICE

DEPARTMENT, pursuant to official or *de facto* policy, custom, and practice, did

intentionally, knowingly, or with deliberate indifference to the rights of the Plaintiff, fail

to train, instruct, supervise, control and/or discipline, on a continuing basis it officers in

the performance of their duties. Thus, they are liable for Defendants' misconduct.

### SIXTH CAUSE OF ACTION

**Pattern of Failure to Train, Supervise, Discipline or Correct Police Officers in violation
of 42 U.S.C. § 1983**

**(Against Defendants: Town of Brookline)**

235.     The preceding paragraphs are here incorporated by reference.

236.     It was the policy and/or custom of the TOWN OF BROOKINE and the

BROOKLINE POLICE DEPARTMENT to fail to take steps to discipline, train,

supervise, or otherwise correct the imprope, illegal conduct of the individiual defendants

in this and in similiar cases involving misconduct, thereby failing to adequately

discrouage further constitutional violations on the part of its police officers.

237.     Plaintiff is informed, believes and thereupon alleges that Defendants Town of

Brookline have failed to properly train, supervise and/or discipline employees, officers,

managers and supervisors within the Town and/or Brookline Police Department as to the

legal requirements and protections applicable to persons as set forth in the U.S.

Constitutions, and other laws.

238.     Plaintiff alleges that these failures amount to a *de facto* policy and are intentional

or the result of deliberate indifference on the part of Defendant TOWN OF

BROOKLINE, by and through its decision-makers.

239.     The existence of the aforesaid unconstitutional policies, practices, customs and/or

usages may be inferred from repeated occurrences of similar wrongful conduct.

Defendant maintained the above described policies, practices, customs or usages knowing

fully well that the policies, practices, customs or usages lead to improper conduct by its

police officers and employees.

240.     The foregoing unconstitutional acts and/or omissions were a direct and legal

cause of harm to Plaintiff.

## REQUEST FOR JURY TRIAL

1. Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury of all issues so triable as of right.

## PRAYER FOR RELIEF

**WHEREFORE,** having asserted various causes of action and alleging facts in support thereof, Plaintiff prays that this Court assume jurisdiction in this entire matter and that the following relief be granted:

    a. Enter a declaratory judgement that the Defendants violated Plaintiff's Fourth Amendment right to be free from unreasonable seizure and Fourteenth Amendment right to Equal Protection.

    b. Award compensatory damages against all Defendants, joint and severally, in an amount to be determined at trial, for pain and suffering, emotional distress, mental anguish and/or related emotional damages that Plaintiffs have incurred as a result of Defendants' unlawful conduct.

    c. Award punitive damages against Defendants Pilgrim, Moreland, Vragovic, and Merrigan

    d. Award interest, both pre- and post-judgment, as allowed by law;

    e. Award Plaintiff's costs, expenses and reasonable attorney's fees pursuant to 42 U.S.C. § 1988

    f. Award such other and further relief that the Court may deem just.

Respectfully submitted this 11th day of June, 2020.

**s/ Chiuba Eugene Obele**
Plaintiff *Pro Se*
40 Westwind Road, Apartment #556
Boston, MA 02125
chiuba@gmail.com
617-413-3254